Number 181995, Scott Breiding et al. v. Eversource Energy O. Thank you. Thanks. Good morning, Mr. Sowell. Good morning, Your Honor. Tom Sowell for the proposed class of New England Electricity Purchasers. May I reserve three minutes, Your Honor? You may. When I was reviewing the briefs and preparing for this argument, it occurred to me quite clearly that it would be best to more coachably frame the structure of what I think the Court's analysis should be in this case. And I think it's twofold. First, it starts with this. Whether under the Natural Gas Act, 15 U.S.C. 1717b, and under the Federal Power Act, does FERC have exclusive jurisdiction over the claims here? If it has exclusive jurisdiction, then the plaintiffs are out. If the FERC has no jurisdiction, the plaintiffs are fine on this analysis. What if there's shared jurisdiction? In other words, what if the states can also exercise jurisdiction here? In that situation, then the question would be whether FERC's exercise of its jurisdiction is such that the conduct alleged has been specifically permitted by FERC. I can see why you're arguing that, but it seems to me that this case boils down to whether the file rate doctrine applies or not, and the reasons for it. It would exclude the scenario you're trying to pose before us. So I think that I agree the issue has been framed by the parties as the file rate doctrine. What I'm suggesting is that the file rate doctrine has two analyses to it. One is a field question. Another is more of a conflict question. So I'll give you an example of this. If the jurisdiction, here we argue quite clearly that the jurisdiction of the Natural Gas Act does not give FERC the power to regulate retail gas sales. It does not, and it has left that explicitly to the states. The case that I think that is most important for this court to look at in terms of, and if that jurisdiction, by the way, if the scope of the Natural Gas Act does not go to these claims, then by definition anything that FERC may or may not have done with respect to these claims would not be the file rate doctrine. That's how I draw the connection between the two. If we take your formulation, and so we ask, we say that preemption hinges on whether FERC permitted the conducted issue. As I understand it, the conducted issue is exercising options and rights that were permitted by a contract that FERC expressly approved. So two things, Your Honor. The first is this. The conduct that we're talking about is rights to transmission. That does fall, transmission does fall within the jurisdiction of FERC. However, the consequence of the exercise or non-exercise of that right on transmission had a consequence for the retail gas sales. Sure, but virtually anything that affects wholesale prices is likely to have a follow-on effect. Absolutely, Your Honor. So I don't think we can simply ask that question. Let's look at it this way. Let's assume that efficient use of the capacity of the pipeline is an issue that is in the sweet spot of FERC's concerns, the whole transmission of gas over the Algonquin pipeline. And then FERC, with that in mind, says you can have one of these no-notice contracts that allow you to reserve but not use nor resell gas, and then they watch it play out. Why would a state court, for example, or a court under another jurisdiction, come in and say, well, you know, they really shouldn't have that ability just to waylay capacity? Sure. When FERC has said you effectively can waylay capacity. Sure. So that's exactly the question, Your Honor, that the Supreme Court took up in the Oneok case. There, the question was that the retail purchasers, Oneok 135, Supreme Court 1591. There, retail purchasers of gas complained that the wholesalers, that wholesale prices had been manipulated by the pipeline. I'm familiar with that case, but it seems that goes back to your formulation. The majority in that case expressly said, if I remember correctly, that we're dealing with field, not conflict, preemption. And secondly, that the rates at issue there, the conduct that was being challenged, had not been permitted by or blessed in any way by FERC, so you didn't have any conflict. Here I keep coming back to what seems to be, and maybe I'm wrong, you correct me, but it seems that what's at issue here, the alleged wrongful conduct, is the exercise of rights expressly given by FERC, and in a manner that FERC seems to have no problem with. Yeah. So two things, Your Honor. I think if you compare the facts of Oneok to the facts here, the kind of regulation that FERC had exercised in Oneok was actually far more prevalent than it is here. There's an old swing song called, it ain't what you do, it's the way that you do it. And here, it's not the fact that they had the right to be able to exercise their no-notice rights. It was the way that they did it. And the way that they did it was the manipulation. And I go back to Oneok then. Oneok also gets us to another issue in the case, which is you have the manipulation in the market, and then it raises retail rights, and the court allows the purchasers to sue. Those would be here, the generators, or the customers of LDC. As I understand it here, the purchasers of the gas that came out of Oneok have not sued. That is correct. So Oneok itself actually does not deal with this sort of standing or remoteness question, right? Sure. This is more of a question later on in this case. Here what I would say is the focus should be on the state law rights of end payers to be able to bring a claim under state law. And so that would be the answer to that. Has there been an argument made or preserved below that under the state antitrust laws, the concept of antitrust injury would be applied differently than it would be under the Sherman Act? My understanding is that the defendants actually conceded at ECF number 55, page 10, footnote 11, that the AGC analysis, the federal standing analysis, would not apply to Massachusetts or New Hampshire state law claims. That may be, but I don't recall in the district court, at least as an alternative ruling, dismissed the state law claims for want of supplementary jurisdiction because the federal claims didn't stand. I don't recall any argument in your brief that that ruling was erroneous or that the state claims should proceed independently notwithstanding that ruling. I think Your Honor is correct that there's no argument to that effect there. Well, then therefore under the Zunino principle, that argument is then gone. So even if there is antitrust injury for state statute purposes, that's got to be litigated in a state court proceeding, not in this proceeding. I think there's a practical matter. First of all, I concede, Your Honor, absolutely, that the argument was not made in the brief. Absolutely. I think the practical matter of what happened here is that ruling for not having supplementary jurisdiction is without prejudice. The claims would be brought again. The action would be still filed in federal court because they would still fall within the Class Action Fairness Act under CAFA. Well, that may be, but you can't reinvent your current federal action on the fly. If what you're saying is, well, maybe we've got another federal action that we haven't brought yet, all right, that may be possible, but we can't reinvent it for you in this court. We've got to hear and decide the case that the district court heard and decided and determine your assignments of error in the manner in which you've raised them and briefed them. Sure. And I think the assignments of error are, first, that the file rate doctrine does not apply because FERC does not have exclusive jurisdiction under either the National Gas Act or the Federal Power Act, number one. Second, there's no conflict, if you will, federal file rate doctrine issue, because the conduct of the issue has not been explicitly permitted. Instead, the kind of activity is allowed, but not the specific manipulation. And that's why I'd also go to owning up there. Third, Your Honor, in terms of what's been fled correctly or not, this case certainly pleads quite clearly state law violations under the first counts of the complaint. The basis for jurisdiction might alter, given the district court's ruling not to take supplementary jurisdiction, but the district court would still have jurisdiction under CAFA. I think that would be the proper structure of that analysis, if you will. So when I asked you about antitrust injury, your answer referred me to doctrines under state law, specifically Massachusetts and New Hampshire. Do I correctly infer from that that you're not contending that there is antitrust injury here under federal law? You infer correctly, Your Honor. My review of this brief and the current state of the pleadings and what's before the court here is that there's no direct purchaser standing. So I concede that unequivocally. That's a little bit different than what I specifically asked. I intended to not modify your statement in any way whatsoever, Your Honor. Has any relief been sought directly from the FERC to prohibit this practice? Have we? I'm sorry, I didn't hear you. You or anyone. It seems like there's something wrong taking place here. I don't know whether anyone else has. We have not. We've sought to assert these state law claims in this court. It is the case that FERC issued a press release indicating something to the effect that they had taken a look at this and they had found no effect on things within its jurisdiction, i.e. within wholesale sales. Our briefs indicate that a press release that does not articulate the data, the rationale that was undertaken, and is still by definition only reaching a decision within its jurisdiction, i.e. wholesale sales, not retail sales, is not meaningful at this procedural stage of the 12B6. So we have not, Your Honor. But I think behind that question is a choice of forum. I'll tell you behind the question is, I think the final rate doctrine presents a big problem for your case here. It seems to me the way to resolve this is go to the people that set the rate and have them issue some kind of a rule that prohibits this practice. In response to that, Your Honor, all I can simply say is that if the court has the opportunity to read the O'Neill case, I think that the Supreme Court has clearly held that state law rights of consumers is a vehicle that should be available, regardless of the final rate doctrine or preemption doctrines, because, in fact, the jurisdiction of FERC is in this kind of a situation quite shared, and I think that's the explicit ruling of that case. Mr. Sobel, you've been very helpful. I want to make sure, though, that I'm not overstating what I hear you saying, Michael Beck. What I'm distilling out of this is that the federal claims, we can affirm the dismissal of the federal claims without ever addressing the final rate doctrine based on an absence of antitrust injury. That then leaves the court's determination below to defer supplemental jurisdiction on the state law claims without ruling on the merits. The issue there should be whether we should allow, in this procedural posture, some reconsideration of that ruling or simply say that ruling hasn't been preserved and then let this play out with maybe filing in state court, then come back under CAFA, leaving the state law claims at that point where it might be necessary then to address final rate doctrine. So the answer is yes, but I want to make sure that we're speaking straightforwardly with one another. There is a federal claim for injunctive relief that does not apply, and so that has to be an exception to that, if you will, Your Honor. And then, well, I think other than that exception, yes, Your Honor. The answer is yes. Thank you. Mr. Bress, good morning. Good morning. May it please the Court, I am Richard Bress. I represent Avangrid, and I will be arguing for the first 7 1⁄2 minutes. My colleague, John Donovan, represents Craver's Force. He'll be arguing. We're both arguing on behalf of both defendants, and he'll be arguing for the second 7 1⁄2 minutes. I'll be addressing primarily filed rate. And I guess I should start in a way, Judge Cato, with your last question. I do think certainly it's possible at this point that this Court could simply recognize that the federal claim, antitrust claims, have been abandoned and send it back down to the district court. Right. I think they've quite abandoned it. I think they've narrowed it to the injunctive relief claim. Okay. Well, that makes my task even easier, Your Honor, because I would ask this Court to reach the filed rate doctrine in this case, I think, for matters of judicial efficiency, and because I think that the court below did intend to eliminate the state and federal claims on that basis. I mean, it's the best reading on that. If that's so, why would the district judge have dismissed the supplemental claims without prejudice, if she intended to eliminate them? Your Honor, I acknowledge that the opinion below is not terribly clear on this. Well, I think it's very clear. I think it's very clear. Dismissal of state law claims without prejudice means that those claims can be refiled in a state court. Yes, Your Honor, and I understand that. I believe that it's just its placement in that paragraph where it was dealing with other reasons for getting rid of state law claims, as compared to its earlier statements that the state law claims were barred by the filed rate doctrine. But don't you agree that the question of whether the filed rate doctrine precludes a substantive claim could be a slightly different question if the substantive claim is a federal antitrust claim than if the substantive claim is a Massachusetts state law claim. The analysis might be different because perhaps the specific conduct being regulated in a way is arguably more of a state interest than the balancing. Wouldn't that be a possibility? Your Honor, I can understand someone so arguing, but no, I don't believe so. I think cases like Entergy, cases like ARCLA, etc., have treated the state law claims the same way, and frankly, they've been asserted the same way. There isn't a different injury that's been complained of here, and there isn't different conduct that's been complained of. But maybe I could start with the conduct. And I'm using, actually, my colleague's framework here because I think it's helpful. He said, does FERC have exclusive jurisdiction over the claims at issue? Well, the only misconduct that's being alleged here is alleged misconduct of failing to release capacity in the gas transmission market. That market is undoubtedly substantially and exclusively regulated by FERC, and indeed it's governed by a tariff that was approved by FERC. And as a matter of FERC regulation, Rule 636, and as a matter of the tariff, the local distribution companies have the right to not do any release at all if they don't want to release, and there's a reason for that, which is FERC was primarily concerned with reliability of the gas supply to consumers. The precedent conduct here isn't so much that they didn't use all the capacity that they reserved. It's that having determined not to use it, they passed on the option to sell it. And I know we're only at a 12 to 6 stage, so you're handicapped in terms of offering a reason. But unless we can think of some reason why that would be economically rational, then you start to scratch your head that the only rational explanation would be some perceived possession of market power. I'd like to address that in two respects, Sean, in two ways. The first answer is that FERC itself explained in Order 636 what was going on here. And it explained it in the context of explaining no-notice contracts and why the pipeline has to reserve the full amount of the daily allocation regardless of any adjustments that go up or down during the day. And the reason is the LDC, the local distribution company, has to have the ability at any moment to draw on its full capacity because of weather changes. So the fact that we, the LDCs, took that path and reserved the capacity and chose not to, in the end, release it, is perfectly consistent and it's explained by the PURE decision by the Connecticut regulators. They looked at this very conduct and what they said is that it is very risky for consumers, for the local distribution company, to release power because weather changes, weather can change quickly, and it risks a gas shortage. So what you're saying then, I hear what you're saying, it seems to me you're saying that there never was a moment in time when they could be consistently 100% certain that they wouldn't need the capacity. That's what the Connecticut regulators found, Your Honor. They found that there was a reasonable exercise of the discretion in this case. And what they found also was that the interests of consumers, both economically and in terms of safety, was so strong that it outweighed the marginal benefit of any releases. Now, to answer this in a somewhat different way, FERC decided, as a matter, again, of its federal rule and in approving the tariff here, that that's the right way to think about it and that the discretion should be with the local distribution company. If plaintiffs don't like that, they think that that rule leads to unjust and unreasonable results, they've got a way of handling that, and that's filing a 206 complaint with FERC seeking to change the tariff and impose more rules on it. What they can't do is collaboratively attack the tariff by seeking an injunction in just a civil action and trying to get a court to simply alter the tariff or tamper with the tariff through an injunctive relief. Suppose the two LDCs here were meeting periodically their CEOs each week and conspiring to hold on to the capacity and not let it go to the drive up. Would the file rate doctrine apply to a request by someone under the Sherman Act to enjoin that behavior? Well, injunctions against conduct that are outside of the actual process, Your Honor, are possible under Georgia versus Pennsylvania Railroad. However, that case found that that was so only because back then, which was almost a century ago, FERC lacked the power and the court, it wasn't FERC, Federal Power Commission, lacked the power. The court repeated this five times to address that problem on its own. I think the case probably comes out differently today given the anti-manipulation rules. FERC actively supervises the market and monitors it. So does the independent monitor. So does the external monitor for ISO New England. They're constantly monitoring this. In fact, the Office of Enforcement looked at the conduct in this very case and while my colleague would like to denigrate it, what FERC's Office of Enforcement explained is they extensively reviewed the public and non-public evidence and found no evidence whatsoever of anti-competitive withholding. But then we're looking, FERC was also looking at manipulation in Oneok and yet the court held the file rate doctrine did not proceed, treated that as background conduct. I know I don't have much time, but as this just came in last night, if the court would allow me to distinguish Oneok, I'd be happy to do that. You tie it up. Thank you. You can certainly submit a response to the 28J letter. Yep. Thank you. Mr. Donald, good morning. Thank you, Your Honor. Good morning. And may it please the Court. What I'd say is, first of all, I understand the case to be Oneok. And Oneok is not a rate case. It is not a tariff case. It is a case that does not address FERC's tariff. And that is the fundamental distinction. It also does not deal with conflict preemption, as you said. We will submit something in addition, but those are the fundamental principle distinguishing characteristics that make Oneok irrelevant. Well, as a third distinction, it also deals with direct purchases. Precisely. And Oneok is also a case that was decided in 2015, two years before this complaint was filed. If there was a legitimate theory that someone would have thought that they could shoehorn a case through Oneok, one would have thought you'd think of it before last night. Second, Judge Kayaga, you ask precisely the right questions when you ask, what is it about the conduct here in the transportation market that is outside of FERC's jurisdiction? What the plaintiff struggled to do is to say that this is a case about spot market gas, which is not regulated by FERC. That's not true. First of all, resales, sales for resale, are regulated by FERC. But second and more important, the conduct that is at issue here is all in the gas transportation market. You ask the question, two questions. One, is there any rational reason that someone would not sell gas if they realized there was not capacity? Well, there's nothing to complain about that. But in fact, there are plenty of reasons that someone would not sell capacity, again, because of possible changes in weather or otherwise. There's not even an allegation that either Avangrid or Eversource does not sell into that market. And in fact, they do, in their discretion. But what that does is illustrate precisely why the filing rate applies. If you said that there was some circumstance in which a voluntary program to exercise your discretion, to cancel reservations, to downschedule, and then you must sell, what would the standard be that someone would say you must apply, that a court would have to apply in saying you must sell? Is it that the temperature went up? Is it that the capacity of someone else was at stake? That illustrates the problem of a court imposing a mandatory obligation on what Order 636 of FERC, this tariff, and what separately FERC has said is a purely voluntary program. That illustrates precisely why filed rate has to apply. Don't forget, this case has filed rate on two sides, not just the gas side, but also on the electric side. The claim is that the effect of the manipulation, of extensible manipulation of gas prices, ultimately influenced retail prices through the operation of the electric wholesale mechanism. Well, that seems a little bit of a stretch because it doesn't challenge the conduct in the electricity market. It's basically using filed rate doctrine to kind of launder misconduct that would have occurred upstream of that market. And that strikes me as a little bit of a stretch. Well, the point is that the electric rate that is ultimately set through the wholesale process is FERC approved. And this Court's decision in Count Norwood says the filing of those tariffs, the filing of those rates, and the filing with FERC of the results of that process puts it within the FERC's jurisdiction. Suppose your clients decided to blow up the regenerating plants to drive up electricity rates, and then the rates would naturally go up in the spot market. They would be sold pursuant to FERC procedures. They'd be very high. Would your clients then be immune to a suit by rate payers saying, hey, we ultimately went through the FERC one, so don't pay any attention to us blowing up the plants? I imagine someone could think of an extreme example like that, but that's not this case. What's different, in other words, what you're conceding is that there could be conduct that predates the sale in the particular market, here the electricity market, that would not be immunized by the fact that the actual purchasers who were the planters purchased in the regulated market. I just don't know where that line is, Your Honor. But that's the issue then, right? Well, but the issue was whether the antitrust laws can cut across this. And this is a case, remember, under Section 2. This is a case for monopolization. And the claim is that the upstream market conduct, conduct in a market that this blanket does not participate in, is not a consumer, is not a competitor, is not a buyer, is nothing, affected prices downstream. As a matter of monopolization, well, you have to ask the question, what is it about influencing gas prices for the purpose ostensibly of influencing wholesale and then electric prices enhances, creates, extends a monopoly? That's the causal connection that you have to ask, and it's missing in this case. But I recognize I have little time left. Let me briefly address what Judge Casper did with respect to the state law claims. First of all, the defendants did not concede below that standing or anything else did not arise under state law. What we said was that there is no decision in Massachusetts or New Hampshire that follows the AGC factors for granting standing. And, in fact, Judge Casper, with respect to the Maine statute, which there had been AGC precedent, said there was no standing. But she separately said the filed rates doctrine applies with equal force to plaintiff state law claims. The plaintiffs have said nothing about that, and they've said nothing with respect to the dismissal on supplementary jurisdiction grounds in their wreaths. I would suggest, as Judge Shiley commented, the argument is weighed. If they don't contest the dismissal on any basis, they don't contest it on any basis. And there is ample ground that this Court has to say, just as Judge Casper said, that the plaintiff's state law claims are subject to FERC. The plaintiff's state law claims lack causation. The plaintiff's state law claims lack antitrust injury. And there is no reason to send this back for any more. This is a case, ultimately, where bystanders have created a claim about manipulation that doesn't make logical sense, if their complaint is virtually all about downscheduling. Downscheduling doesn't change capacity in the market at all, because under Voter 636, the pipeline is obliged to maintain 100 percent of reserve capacity no matter what. It doesn't affect capacity. So that is a contrivance of a claim by people who don't participate in this market. Antitrust standing doesn't extend to market bystanders, and there's no reason that this dismissal should not be affirmed. Do you agree with Mr. Sobel's point that the antitrust standing defense doesn't apply to the injunctive claim? I think it does apply. I do not agree with that, for the precise reasons that this Court has said before in SAR and SERPA and the rest. Thank you, Your Honor. May I proceed? So the New England electricity purchasers are bystanders, even though they, according to the allegations of the complaint, spent over $3 billion more than they otherwise would, according to the defendants. Their argument is trying to focus on the nature of the conduct being in the transmission area, but as I've indicated, ONIOC says you don't look to the conduct, you look at the aim of the kind of claim that you have, that issue. The Court could not have been more clear about that. They argue against the allegations of the complaint. The complaint indicates that these defendants could have and should have released the available gas to make it available to the stock market, but they did not, and the complaint goes to great pains to show how their conduct was aberrant if you compare it to the rest of the marketplace. They go on and detail as well how it is that it had motivations to be able to do that and how it is that it injured real people day to day throughout the region. The tariff says nothing at all that permits this kind of abuse. As in ONIOC, where there was manipulation that had happened regarding wholesale sales, here we allege there was manipulation that affected both wholesale and retail sales. There is no difference. There certainly is a difference in who the plaintiff is. To be sure, ONIOC was not addressing, and the reasoning of ONIOC did not hinge one iota on the kind of plaintiff it was in terms of whether they were direct or indirect. It was that there were state law claims that were being raised. Yeah, but state law claims that aren't raised here, no claims under Massachusetts or New Hampshire law. Well, there were before the District Court, yes. In ONIOC, there were state law claims under Massachusetts or New Hampshire law? No, there did not involve state law claims in this region. The reasoning, I think, is important to understand from ONIOC because it is a decision that addresses the jurisdiction of FERC and the scope of the Natural Gas Act. In making that decision, the court said that this is a very different kind of a situation than you might normally see when you have some federal commission being granted powers. Here, Congress went out of its way to do two things. It granted some powers, but it explicitly, in both the MGA and the FPA, said that there are areas where FERC may not go and may not impinge, which is the unregulated retail sale of gas, the unregulated retail purchase of electricity. Both of those areas. You want us to reason that based on the allegations in the complaint, the aim of the improper conduct was in the retail market, and secondly, the conduct used to achieve that aim was analogous to the false providing of prices in ONIOC. Correct, and that the kind of regulation that you saw in ONIOC, which was that the kind of manipulation that was going on was actually being regulated for real in ONIOC, was not an impediment to the state law claims going forward either. Thank you very much for your time. Thank you, Charles.